EXECUTION COPY

## ARDAGH CUSTOMER PRODUCTS TAKE OR PAY SUPPLY AGREEMENT

This CUSTOMER PRODUCTS TAKE OR PAY SUPPLY AGREEMENT (this "Agreement") is made this 10th day of January, 2022, and effective as of January 10, 2022, by and between ZUCKERMAN-HONICKMAN INC., a Pennsylvania corporation ("Seller"), and LORD HOBO BREWING COMPANY, LLC ("Buyer;" either Seller or Buyer, a "Party and jointly the "Parties").

In consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### 1. REQUIREMENTS

**1.1 Sale of Products.** Seller agrees to supply and arrange the delivery of products to Buyer, and Buyer agrees to purchase, accept from Seller, and pay for, one hundred percent (100%) of Buyer's required annual Volume Forecast (as set forth in Section 3.1) of products meeting the type, size and specifications (the "Specifications") set forth on Schedule "A" (collectively, the "Products"), the contents of which are incorporated herein by reference, which may only be changed from time to time upon written agreement signed by the Buyer and Seller. During the Term, Seller shall be the exclusive sale agent to Buyer for the Take or Pay Volume (as set forth in Section 3.1) of the Products, so long as Seller is able to supply the required volume of Products on a timely basis and otherwise in accordance with this Agreement.

**1.2 Manufacturer.** The Manufacturer of the Products to be supplied hereunder shall be ARDAGH METAL BEVERAGE, INC. (the "Manufacturer"), as well as any other manufacturer(s) if Seller deems it is in the best interest of Buyer, and Buyer provides its prior written consent to substitute manufacturer, which may be withheld in Buyer's sole discretion.

**1.2.1 No Contact with or Purchase from Manufacturer.** Buyer agrees that it shall not during the Term (the "Period of Restriction"), directly or indirectly, solicit or induce the Manufacturer to supply any Products or have any direct contact with the Manufacturer. In the event of any breach of the Period of Restriction by Buyer, the Buyer shall pay to Seller twenty percent (20%) of the aggregate gross sales price paid to Manufacturer for Buyer's prohibited business dealings with Manufacturer as of the date of the request (and thereafter throughout the Period of Restriction).

**1.3 Purchase Price.** The price to be paid by Buyer for the Products shall be the price per thousand of the Products as set forth in Schedule "A" (the "Base Price") hereof. Except for increases or decreases as provided in Schedule "A" and/or Sections 1.4 or 1.5 or 1.6, or except as may otherwise be agreed upon in writing by Buyer and Seller, the purchase price for each type of Products shall remain firm throughout the Term.

**1.4 Adjustments to Metal.** Beginning on February 1, 2022, the Base Price shall be adjusted to reflect Market Metal and shall continue to be adjusted monthly thereafter; provided, however, any such increase shall not exceed 15% in any one month (the "Maximum Monthly Percentage Increase") ("Metal Adjustment Date"). Market Metal shall mean the daily average of the MW US Transaction price as published by Platts (the "LME/MWP") ingot price from the 16th day of the month two (2) months prior to the Metal Adjustment Date through and including the 15th day of the month prior to the Metal Adjustment Date (e.g. Market Metal for November 1 shall be calculated from the 16th of September through and including the 15th of October). The above Base Prices are based on LME + MWP of $1.10/lb. For every $0.01 /pound change in the USTP (LME & MWP), the Base Price for one thousand units of the following Cans will be adjusted as follows:

| Can Size | Metal Adjustment Factor | Base Price adjustment for each $.01 / lb. Change in the USTP |
|---|---|---|
| 7.5 oz. Sleek | 18 | $0.18 |
| 8 oz. | 19 | $0.19 |
| 10.5 oz. Sleek | 22 | $0.22 |
| 12 oz. | 24 | $0.24 |
| 12 oz. Sleek | 24 | $0.24 |
| 16 oz. | 28 | $0.28 |
| 24 oz. | 45 | $0.45 |
| 202 B64 end | 6 | $0.06 |
| 209 end | 10 | $0.10 |

1.5     **Inflationary Price Adjustments.** Beginning on January 1, 2023, an annual adjustment not to exceed 2% shall be made of each year based upon a composite index which is applied to the conversion component of the price (is not applied to metal). This is a two-part composite index based on labor and materials inflation published by the Bureau of Labor Statistics. The following are the inflation index references:_____

"Employment Cost Index - Total Compensation for Private Industry Workers" from the Bureau of Labor Statistics (CIU2013000000000I).

"Producer Price Index - Chemicals and Allied Products" from the Bureau of Labor Statistics (WPU06).

The following is the conversion price inflation adjustment mechanism:

      i.    2023 price adjustment = [2022 conversion price] x [ (A2021* − A2020*) x 60%] + [ (B2021* − B2020*) x 40% ]

      ii.    2024 price adjustment = [2023 conversion price] x [ (A2022* − A2021*) x 60%] + [ (B2022* − B2021*) x 40% ]

      iii.    Any price adjustment for 2025 or future years will be calculated using the same formula, but adjusted for the appropriate years.

1.6     **Manufacturer Price Adjustments.** If Manufacturer increases the price of the Products, Seller shall send to Buyer written notification of the new prices Buyer must pay Seller for the Products.

1.7     **Minimum Production Requirements.** Buyer's minimum quantity order for Products shall be one (1) full truckload (twenty-five (25) pallets) per SKU.

## 2.     TERM; TERMINATION

2.1     **Term.** The initial term of this Agreement will commence on the date of the initial shipment of Products to the Buyer which should be 3-1-2022 (the "Commencement Date") and continue for forty-eight (48) months thereafter (the "Initial Term"), unless earlier terminated as provided in this Agreement. After the Initial Term, this Agreement shall automatically renew for successive twelve

38931\13\951571.v2-12/14/21

(12) month terms (each, a "Renewal Term") unless either Party shall give the other written notice of its intention to terminate this Agreement no less than ninety (90) days prior to the expiration of the Initial Term or the then current Renewal Term, as the case may be. The Initial Term and all Renewal Terms are collectively referred to herein as the "Term."

2.2     **Manufacturer Termination.** This Agreement may be terminated by Seller without penalty to Seller if Seller's supply agreement with Manufacturer (the "Supply Agreement") expires or is terminated for any reason whatsoever. Seller will provide prompt written notice to Buyer to the extent Seller's supply agreement with Manufacturer expires or is terminated. The current expiration date of the Supply Agreement is _____.

2.3     **Failure to Perform.** Either Party shall have the right to terminate this Agreement (the "Non-Breaching Party") without penalty, upon written notice to the other, if the other Party shall breach any term of this Agreement (the "Breaching Party"), and such failure shall continue for a period of thirty (30) days after the Non-Breaching Party has sent written notice of such breach to the Breaching Party. To the extent this Agreement is terminated by Buyer as the Non-Breaching Party due to Seller's breach of this Agreement (and failure to cure in accordance with the terms herein), Buyer may purchase Products from another source without penalty or liability therefore to Seller.

2.4     **Effect of Termination.** Upon termination all obligations hereunder other than those under Sections 8.1 and 10.1 shall cease, except that both Buyer and Seller shall be obligated to perform and pay under all purchase orders submitted prior to the date of termination or expiration.

3.     **SERVICE**

3.1     **Term Forecast and Rolling Forecast; Take or Pay Quantity.** Prior to the start of every calendar year throughout the Term, Buyer shall provide Seller with a written twelve (12) month forecast of Buyer's anticipated requirements for Products for the Term, with expected seasonality, broken down by month ("Volume Forecast"), but Buyer agrees that it will be obligated over each twelve (12) month period of each Volume Forecast to purchase no less than one hundred percent (100%) of the applicable Volume Forecast for each calendar year (pro-rated for partial calendar years) of the Term (the "Take or Pay Volume" set forth in Schedule "A"). In the event that Buyer fails or refuses to purchase at least the Take or Pay Volume during each calendar year, thereby creating a volume shortfall (the "Shortfall") in that calendar year, then within ten (10) days after the end of such calendar year the Seller shall provide written notice to the Buyer of the Shortfall, with an invoice for the amount due from Buyer thereunder (which shall be calculated by multiplying the number of unpurchased Products by the current Base Price less Seller's costs to produce or acquire such Product to arrive at the "Shortfall Amount"), which shall be paid by Buyer to Seller in accordance with the payment terms set forth in Section 4.1. Buyer shall also provide to Seller in writing at least fifteen (15) days prior to the start of each calendar month, a rolling ninety day (90) forecast of anticipated purchases of Product for each month of the ninety (90) day period, which shall be deemed to be a binding purchase order from Buyer.

4.     **PAYMENT**

4.1     **Payment Terms.** Payment terms shall be net thirty (30) days from date of invoice, after which payment shall be deemed to be overdue. All payments shall be made by wire transfer or ACH and shall be received by the due date.

4.2     **Interest.** Interest on overdue amounts shall be charged at the lesser of (a) the "prime rate of interest" as published in *The Wall Street Journal* on the invoice date, plus two percent (2%) per annum, or (b) the maximum interest permitted by applicable state law.

4.3     **Collection Costs.** In the event that Seller incurs collection costs in connection with any overdue account of Buyer, Buyer shall be responsible for all collection costs, including, without limitation, reasonable attorney's fees, whether or not suit is ever instituted.

**4.4    Storage Charges.** Seller agrees to store Products for up to ninety (90) days after the later of the date of the subject Products' manufacture, or Buyer's requested shipping date of those Products, without charge to Buyer. Thereafter, Buyer will be responsible to pay Seller's announced storage charges and to pay for all Products in full after three (3) months of storage with Products to be shipped to a destination selected in writing by Buyer or destroyed at the direction of Seller.

5.    **DELIVERY**

**5.1    Packaging.** All Products will be bulk packed.

**5.2    Delivery.** All deliveries will be F.O.B. Manufacturer's facility. Buyer shall pay all shipping costs from that point.

6.    **DUNNAGE**

**6.1    Dunnage.** Dunnage shall be memo billed, consistent with the Orbis Pallet Return System, the specifics of which are attached hereto as Schedule "B" and incorporated herein by reference.

7.    **QUALITY; WARRANTIES**

**7.1    Quality.** Buyer shall be entitled to reject and isolate any and all Products that are determined by Buyer within ten (10) days following delivery to not be in conformity with the Specifications. Seller shall, within ten (10) days of notice from Buyer, replace any such Products with other Products that meet Specifications. Should Seller be unable to meet Buyer's requirements for replacement Products, then Buyer will have the right to purchase Products elsewhere at Buyer's expense until such problems are resolved to Buyer's reasonable satisfaction, and if not resolved within ten (10) days, to terminate this Agreement without recourse to Buyer.

**7.2    Warranties and Indemnification.** Seller hereby warrants that the Products shall meet the specific performance criteria provided to Seller by Buyer, be free from defects in workmanship or material to the level of industry standards, and shall conform to all Specifications, unless the defect results from a deficiency in the Specifications furnished by Buyer. Flavor, odor and color of filled beverages in the Products are expressly not warranted by Seller or Manufacturer. Seller shall indemnify and hold Buyer harmless from and against any and all claims and/or liability, including without limitation, reasonable attorneys' fees, suffered or incurred by Buyer as a result of or in connection with Products supplied under this Agreement unless the claim results from (i) the failure of Buyer to accurately communicate to Seller the Specifications; or (ii) any unauthorized representations or the breach of any Buyer's warranties or obligations hereunder; or (iii) the improper handling, storage, filling or transportation of the Products once they have been delivered to and accepted by Buyer; or (iv) the negligence or misconduct on the part of Buyer or its employees, agents, customers or third parties.

**7.2.1**    This warranty is expressly made in lieu of and excludes any and all other warranties, expressed or implied, except for those set forth below. Any warranty claim under Section 7.2 must be made within ninety (90) days of delivery of the non-conforming Products.

**7.3    LIMITATIONS ON WARRANTY.** EXCEPT AS EXPRESSLY SET FORTH IN SECTIONS 7.1 AND 7.2, SELLER MAKES NO WARRANTIES, INCLUDING WARRANTIES AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EITHER EXPRESS OR IMPLIED WITH RESPECT TO ANY OF THE PRODUCTS.

8.    **INDEMNIFICATION; INSURANCE**

**8.1    Indemnification.** Buyer agrees to indemnify Seller of, from and against any and all payments, damages or claims asserted against Seller arising in whole or part from any of the following:

4

(i) by any third party as a result of a breach by Buyer of its duties, obligation or representations under this Agreement, or the negligence or misconduct of Buyer or its agents; and (ii) by any third parties arising from death, injury, damage, loss or destruction of property, any or all of which are alleged to have arisen in whole or in part from the use of the Products, in each case, except to the extent due to the negligence or misconduct of Seller or Seller's breach of this Agreement. Seller agrees to indemnify Buyer of, from and against any and all payments, damages or claims asserted against Buyer (i) by any third parties arising from death, injury, damage, loss or destruction of property, any or all of which are alleged to have arisen in whole or in part to Seller's obligation or performance hereunder or as a result of a breach by Seller of any of its duties, obligations, representations or warranties under this Agreement or the negligence or misconduct of Seller or its agents, and/or (ii) by any third party as a result of the negligence or willful misconduct of Seller, in each case, except to the extent due to the negligence or misconduct of Buyer or Buyer's breach of this Agreement. Any such indemnification under this Section 8.1 shall include, without limitation, reasonable legal fees, out of pocket costs and expenses incurred by the indemnified Party in connection therewith, whether or not suit is ever instituted, and whether or not such claims are groundless. These duties of indemnification shall survive the expiration or earlier termination of this Agreement, and shall continue indefinitely thereafter.

9. **LIMITATIONS**

9.1 **Force Majeure.** If either Party is unable to perform its obligations under this Agreement, or if the Manufacturer is unable to manufacture or deliver the Products as contemplated herein, as a consequence of a delay or failure from any cause or event beyond the control of such Party, including but not limited to war, riots, acts of God or public enemy, terrorism, pandemic or public health emergency (whether or not officially declared as such) including, but not limited to, fire, explosion, flood, earthquake, strikes, lockouts or other labor disturbance, embargo, actions or any governmental authority, such Party (and Seller, if the Manufacturer is unable to perform) shall be excused from the performance of such obligations for the period of and to the extent of any such cause or event but in no event to exceed sixty (60) days.

9.2 **LIMITATION OF LIABILITY.** NEITHER PARTY SHALL HAVE ANY LIABILITY FOR ANY BUSINESS LOSSES OF THE OTHER OR ANY THIRD PARTY, AND THE MEASURE OF DAMAGES HEREUNDER SHALL NOT INCLUDE ANY AMOUNTS FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY LOSS OF REVENUE, PROFIT OR GOODWILL, WHATSOEVER, WHETHER ARISING OUT OF CONTRACT, TORT, IMPOSED BY STATUTE OR OTHERWISE. IN ANY EVENT SELLER'S MAXIMUM MONETARY LIABILITY IN CONNECTION WITH THIS AGREEMENT WILL BE THE AMOUNTS PAID BY BUYER TO SELLER HEREUNDER.

10. **ADDITIONAL PROVISIONS**

10.1 **Assignment.** This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. Neither Party shall assign this Agreement without the prior written consent of the other Party, which consent may be withheld in the sole discretion of the other Party; provided, however, that in the event of any assignment by Buyer, or Buyer's sale (including, but not limited to, transfer by merger, restructuring change in control, or any other means) of the assets or equity of its business (collectively, a "Transfer") to a third party (the "Transferee"), Buyer will use its best efforts to require that the terms of the Transfer will require the Transferee to fully assume all of the terms and conditions of this Agreement, specifically including, but not limited to, Take or Pay Volume, Shortfall Amount and Renewal Term. Buyer hereby expressly agrees that: (i) any attempted Transfer in violation of this Section 10.1 shall be void *ab initio*, and (ii) should the Transferee fail or refuse to fully assume all of the terms and conditions of this Agreement, then in either event Buyer shall remain fully liable to Seller to pay for (and receive delivery of the Products if Buyer so

chooses) the entire Take or Pay Volume for (a) the calendar year in which the Transfer occurs, after credit for such amount as may have already been purchased, and (b) the following calendar year such that the take or pay volume after termination equals twelve (12) months. Buyer further expressly agrees that in the event of any Transfer by Seller, Buyer shall remain fully bound by all of the terms of this Agreement and shall fully perform all of its obligations hereunder to such Transferee as though the Transferee were the Seller; provided, however, that if Seller's Transferee is either Crown Holdings or Ball Corporation (either, a "Designated Transferee"), then Buyer shall have the right in its sole discretion (to be exercised in writing, within ten (10) days (time being expressly understood to be of the essence) of its receipt of written notice from Seller that one of the Designated Transferees is Seller's Transferee) to terminate this Agreement, effective as of the effective date of the Transfer (the "Termination Right"), without liability to Seller or Seller's Transferee as a result of such termination (other than as provided in Section 2.5 of this Agreement). In the event Buyer fails to timely exercise its Termination Right, the Termination Right shall be deemed to have been waived with prejudice, and Buyer shall remain fully bound by all of the terms of this Agreement and shall fully perform all of its obligations hereunder to Seller's Transferee as though the Transferee were the Seller.

        **10.2**    **Notice.** Any notice or other communication required or permitted to be given pursuant to this Agreement shall be deemed duly given only if given in writing, and sent by certified or registered mail, return receipt requested, postage pre-paid to the following addresses, with copies to be sent by facsimile:

      If to Seller:        Zuckerman-Honickman Inc.
                        191 South Gulph Road
                        King of Prussia, PA 19406-3103
                        Attn: Michael F. Zuckerman, President & CEO
                        Fax No.: 610-962-1080
                        Email: mfzuckerman@zh-inc.com

      If to Buyer:        Lord Hobo Brewing Company, LLC
                        5 Draper Street
                        Woburn, MA 10801
                        Attn: Brian Walsh, CEO
                        Email: Brian@lordhobo.com

        With a copy to:

                        Martin C. Pomeroy, Esquire
                        Bernkopf Goodman LLP
                        Two Seaport Lane, 9ᵗʰ Floor
                        Boston, MA 02210
                        Email: mpomeroy@bg-llp.com

or to such other address or addresses as shall be communicated to the Parties hereto in accordance with the provisions of this Section 10.2. Notices shall be deemed to have been received on the date of the mail receipt.

        **10.3**    **Intellectual Property Rights.** Seller shall own and retain all right, title, and interest in and to any intellectual property rights related to the Specifications and design, manufacture or configuration of the Products sold to Buyer.

        **10.4**    **Consent to Jurisdiction, Venue and Service of Process.** Any legal proceeding arising out of this Agreement shall be exclusively brought in the state or federal courts in the

6

Commonwealth of Massachusetts, with good and sufficient service of process by registered or certified mail at the addresses set forth in Section 10.2.

        **10.5**     **Amendment and Waiver.** This Agreement may be amended and any provision hereof waived, but only if in writing and signed by both Parties. A waiver of any breach or failure to enforce any of the terms or conditions of this Agreement shall not in any way affect, limit or waive a Party's rights hereunder at any time to enforce strict compliance thereafter with any term or condition of this Agreement. No partial or single exercise of any right under this Agreement shall constitute a subsequent waiver of that or any other right, unless expressly provided herein.

        **10.6**     **Execution in Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

        **10.7**     **Electronic or Facsimile Signatures.** This Agreement may be executed and delivered by facsimile, email .pdf and other electronic signature and, upon such delivery, the facsimile, email .pdf and other electronic signature will be deemed to have the same effect as if the original signature had been delivered by the other Party.

**10.8**    **Award of Attorney's Fees.**  Should either Party hereto institute any action or proceeding to enforce any provision of this Agreement, the prevailing Party in such action or proceeding shall recover from the other, in addition to any other relief than may be awarded, all reasonable attorneys' fees, costs and expenses incurred by the prevailing Party in connection therewith.

[Signature page follows]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed on the day and year first above written.

ZUCKERMAN-HONICKMAN INC.                LORD HOBO BREWING COMPANY, LLC

By:  _____            By:  _____
Michael F. Zuckerman, President & CEO    Brian Walsh, CEO

## SCHEDULE "A"

### SPECIFICATIONS, PRICING AND TAKE OR PAY VOLUME

| | |
|---|---|
| Size: | 12 oz. Standard Body Can |
| Pack-out: | Bulk Palletized |
| *Pricing (Notes 1 and 2): | $91.86 per thousand |
| Effective Date: | 1-1-2021 |

| | |
|---|---|
| Size: | 16 oz. Standard Body Can |
| Pack-out: | Bulk Palletized |
| *Pricing (Notes 1 and 2): | $122.07 per thousand |
| Effective Date: | 1-1-2021 |

| | |
|---|---|
| Size: | ABI 202 LOE B64 BPANI Ends |
| Color: | Gold Shell / Gold Tab |
| Pack-out: | Bulk Palletized 180,500 ends |
| Price: | $32.96 per thousand FOB Edison, NJ |
| Effective Date: | 1-1-2021 |

**Note 1:**
- Pricing is F.O.B. Manufacturer's facilities as of initial shipment date
- Custom Design Graphics or Unprinted Brites
- Site locations:
    1) Winston-Salem, NC
    2) Heron, OH Q2 – Q3 2022
    3) Fremont, OH
    4) Chicago, IL
    5) Bishopville, SC
    6) Olive Branch, MS

**Note 2:**
- Minimum run for custom design graphics is 25 pallets. Customer is responsible for reasonable overrun quantities with a plus/minus production tolerance of 10%.
- Annual quantities of purchased cans to be "level loaded" for each calendar year (such that customer receives the same number of cans per month by size, for example purposes only, if customer purchased 12 million 16 oz cans in a calendar year, customer would receive 1 million cans a month).

Prices can change based on factors identified in Sections 1.4, 1.5, and 1.6.

*TAKE OR PAY VOLUME is separately applicable to the purchase of cans with the minimum required purchase quantities for each Product for each of the designated calendar years set forth below:

**2022** - Take or Pay Volume of 2,246,475 12 oz / 2,645,200 16 oz / 4,891,675 Ends

**2023** - Take or Pay Volume of 2,654,925 12 oz / 3,267,600 16 oz / 5,922,525 Ends

**2024** - Take or Pay Volume of 2,859,150 12 oz / 3,423,200 16 oz / 6,282,350 Ends

**2025** - Take or Pay Volume of 3,063,375 12 oz / 3,578,800 16 oz / 6,642,175 Ends

W_CONSHOHOCKEN\615237\2 225778.000
LEGAL\55730919\2
38931\13\951571.v2-12/14/21

## SCHEDULE "B"

Orbis Pallet Return System

W_CONSHOHOCKEN\615237\2  225778.000
LEGAL\55730919\2
38931\13\951571.v2-12/14/21